UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
SOUTHERN DIVISION
AT CHATTANOOGA

| | |
|---|---|
| SOMER TIREY, and husband<br>HUNTER TIREY,<br><br>    Plaintiffs,<br><br>vs.<br><br>PARKRIDGE MEDICAL CENTER, INC.,<br><br>    Defendant. | )<br>)<br>)<br>)<br>)  No. 1:23-cv-_____<br>)<br>)  Jury Trial Demanded<br>)<br>)<br>) |

## COMPLAINT

Plaintiffs Somer Tirey ("Mrs. Tirey") and Hunter Tirey ("Mr. Tirey") file this Complaint against Parkridge Medical Center, Inc. ("Parkridge" or "Defendant") and allege as follows:

### PRELIMINARY STATEMENT

1. Plaintiff Somer Tirey is profoundly deaf and communicates primarily in American Sign Language ("ASL"), which is her expressed, preferred, and most effective means of communication. Her deafness impacted her ability to learn and acquire verbal language from birth.

2. Plaintiff Hunter Tirey is Somer Tirey's husband, who is also profoundly deaf. He communicates exclusively in ASL as his expressed, preferred, and most effective means of communication. His deafness impacted his ability to learn acquire verbal language from an early age.

3.      As Somer Tirey's husband, next-of-kin, and health care power of attorney, Plaintiff Hunter Tirey was the person with the right and the responsibility to make medical decisions on Somer Tirey's behalf in the event that she was unable to do so.  Further, he was the person to whom the medical professionals should have communicated Somer Tirey's condition during her medical treatment, when her ability to understand and advocate for herself was compromised when she was in severe pain, or alternatively, when she was heavily medicated, after surgery and during subsequent medical care.

4.      Defendant hindered and prevented the Plaintiffs from benefitting from its services, and discriminated against the Plaintiffs unlawfully, on the basis of the Plaintiffs' disabilities of deafness by refusing to consistently provide ASL interpreters for the entirety of Mrs. Tirey's medical care. These denials were in spite of Plaintiffs' repeated requests for a live ASL interpreter.

5.      The Plaintiffs bring this action seeking declaratory, injunctive, and equitable relief; compensatory damages; and attorneys' fees and costs to redress Defendant's unlawful discrimination against the Plaintiffs on the basis of their respective disabilities in violation of Title III of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12181 *et seq.*, Section 504 of the Rehabilitation Act of 1973 ("RA"), 29 U.S.C. § 794; Section 1557 of the Patient Protection and Affordable Care Act ("ACA"), 42 U.S.C. § 18116; and other state and common law causes of action.

## THE PARTIES

6.      Plaintiff Somer Tirey brings this action as an individual residing in Chattanooga, Tennessee. Mrs. Tirey is a profoundly deaf individual who has limited verbal English proficiency and who communicates primarily in American Sign Language. Mrs. Tirey is substantially limited

in the major life activities of hearing and speaking and is an individual with a disability within the meaning of federal and state civil rights laws.

7. Plaintiff Hunter Tirey brings this action as an individual residing in Chattanooga, Tennessee. The Plaintiff is a profoundly deaf individual who has limited verbal English proficiency and who communicates exclusively in American Sign Language. Mr. Tirey is substantially limited in the major life activities of hearing and speaking and is an individual with a disability within the meaning of federal and state civil rights laws.

8. Defendant Parkridge Medical Center, Inc. is a corporation with a corporate address of 1 Park Plaza, Nashville, Tennessee 37203-6527.

9. Defendant can be served through its registered agent, CT Corporation System, 300 Montvue Road, Knoxville, TN 37919-5546.

## JURISDICTION AND VENUE

10. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1343 for the Plaintiffs' claims arising under the laws of the United States, and supplemental jurisdiction pursuant to 28 U.S.C. § 1367 for Plaintiffs' claims arising under state and local laws.

11. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because the Defendants business is situated in the district, and/or because the Defendants have sufficient contacts with this District to subject it to personal jurisdiction and had those contacts at the time this action is commenced, and/or the acts and omissions giving rise to this Complaint occurred within this District.

## STATEMENT OF FACTS

12.   Plaintiff Somer Tirey is a deaf individual who communicates primarily in American Sign Language ("ASL").

13.   Mrs. Tirey has limited verbal English proficiency, could not effectively communicate by reading lips, and requires auxiliary aids and services to communicate effectively in a medical setting. [1],[2]

14.   Plaintiff Hunter Tirey is a profoundly deaf individual who communicates exclusively in ASL.

15.   Mr. Tirey has limited verbal English proficiency, cannot effectively communicate by reading lips, and requires auxiliary aids and services to communicate effectively in a medical setting.

16.   On February 11, 2022, Somer Tirey experienced a medical emergency, eventually having surgery at Parkridge Medical Center at 2333 McCallie Avenue, Chattanooga, TN 37404.

---

[1] Lip-reading, or the ability to understand the speech of another by watching the speaker's lips, is an extremely speculative means of communication and is no substitute for direct communication through a qualified sign language interpreter. Only a small number of spoken sounds in aural language are visible, and many of those words appear identical on the lips. Even if a primary ASL user were able to determine the sounds appearing on a speaker's lips, he or she would still not necessarily understand the English language as English and ASL are distinct languages with disparate grammatical structures

[2] In a study at Indiana University conducted by David B. Pisoni and James T. Townsend, of the Department of Psychological and Brain Sciences, testing the accuracy of visual-only sentence recognition, the mean lip-reading score was "12.4% correct with a standard deviation of 6.67%. Even the outliers in the study only scored close to 30% accuracy. "Some normative data on lip-reading skills," J. Acoust. Soc. Am. 130 (1), July 2011, Nicholas A. Aliteri, Department of Psychology, the University of Oklahoma.
https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3155585/

She was admitted on February 11, 2022, and was discharged on February 14, 2022, at approximately 4:00 p.m.

17. Between the February 11, 2022 and February 14, 2022, despite repeated requests, no live ASL interpreters were provided to the Tireys relative to Mrs. Tirey's medical care, or for Mr. Tirey's advocacy relative to her medical care.

18. Despite the Tireys' repeated requests for a live ASL interpreter, the Defendant's only offer to accommodate them was to attempt to provide an interpreter through a Video Remote Interpreting ("VRI") device.[3]

19. This effort failed in multiple ways: (1) the screen regularly froze; (2) the device disconnected; and (3) the video disappeared on several occasions only to be replaced by a black screen.

20. In addition to the above failures, using an interpreter through VRI was not appropriate for Mrs. Tirey because she was in extreme pain, was heavily medicated and her vision was somewhat blurry due to the medication.

21. Moreover, because Mrs. Tirey was laying in the bed, restricted in the ability to reposition herself due to the pain and medication, she was unable to adjust herself so as to see the computer screen at the angle it was positioned, unless it was altered, which made it less visible for Mr. Tirey.

---

[3] Video Remote Interpreting ("VRI") is a video telecommunication service that uses devises such as web cameras or videophones to provide sign language or spoken language interpreting services through a remote or offsite interpreter. VRI is inappropriate in many circumstances, especially when the patient has other conditions that impair the patient's ability to utilize the device, *i.e.*, if the patient has a visual impairment, is in a lot of pain, or cannot achieve the property posture; when there are many people in a room; when staff is inadequately trained to set up or operate the device; or in situations that are especially complicated or emergent.

22. When the VRI failed, various nurses attempted to communicate with the Tireys in written English, using the computer screen that had been used for the VRI. The Tireys experienced the same problems and limitations with the angle of the screen when it was used for attempted written communication.

23. The use of a live ASL interpreter would have ameliorated these issues, as it would have accommodated both Mrs. and Mr. Tirey with clear and effective communication, without restricting the access of the other.

24. As previously indicated, Mrs. Tirey was in extreme pain and was heavily medicated, which impaired her both her ability to read and her ability to see clearly.

25. At one point, a doctor obtained an interpreter on his cell phone through VRI; however, the video was so small due to being on a cell phone that Mrs. Tirey could not see it well.

26. Mrs. Tirey, in great pain and was on strong pain medications, and was relying on her husband's understanding of what was happening in addition to her own.

27. Because the interpreter on video was on a cell phone, Mr. Tirey could not see the video on the cell phone when it was directed toward Mrs. Tirey.

28. The Plaintiffs continued to request a live ASL interpreter, which request was continually denied.

29. Mrs. Tirey was discharged on February 14, 2022, without the benefit of an interpreter. Although Mr. Tirey attempted to convey to medical professionals that Mrs. Tirey needed to have bloodwork done to make sure that it was in her medical best interest to be

discharged, this communication failed for lack of an interpreter, no such bloodwork was completed and Mrs. Tirey was discharged without it.

30. At approximately 7:00 p.m. on February 14, 2022, Mrs. Tirey passed out twice and began experiencing extreme pain.

31. An ambulance was called, and Mrs. Tirey returned to Parkridge to address the emergency.

32. As they had done on during the prior stay, the Tireys requested a live ASL interpreter.

33. Not until the Tireys involved an attorney to contact Parkridge, was a live ASL interpreter provided.

34. Approximately 24 hours later, the following day, February 15, 2022, at approximately 8:00 p.m., while still in the emergency room, the Tireys finally received an interpreter, who stayed for approximately two (2) hours.

35. A second interpreter arrived at approximately 11:00 p.m., stayed for approximately one (1) hour, and was there during Mrs. Tirey's transition from the emergency department to a room.

36. The Plaintiffs learned at this time that Ms. Tirey's pancreas had been nicked during the gallbladder surgery in the prior stay – an example of what the Tireys did not know during the prior stay because of the deprivation of a live ASL interpreter during her February 10 – February 14, 2022, stay in the Defendant's facility.

37. On February 16, 2022, an interpreter arrived at approximately 7:00 a.m. and was there until approximately 10:00 a.m.

38. From 10:00 a.m. on February 16, 2022 through Mrs. Tirey's discharge on February 17, 2023, at approximately 5:00 p.m., no interpreters were provided for the Tireys.

39. During the period when there were no interpreters, at least two (2) doctors and various other medical professionals came in, but without an interpreter, the Plaintiffs had to rely on their limited comprehension.

40. Effective communication did not take place between the Plaintiffs and the Defendants staff because there was no live qualified ASL interpreter.

41. An example of the consequences of the lack of the communication occurred when Mr. Tirey was assisting his wife in using the restroom. While doing so, an individual believed to be a medical student tried to enter the room. Mr. Tirey, attempting to assist his wife, protect their privacy and preserve her dignity, pushed the door closed, leaving it slightly open a crack, attempting to inform the student not to enter at that moment. An employee of the Defendant later came into the room, apparently accusing Mr. Tirey of "kicking out" the medical student. Had an interpreter been provided during this period, the interpreter could have facilitated communication between Mr. Tirey and the medical student.

42. The Tireys again requested an interpreter at approximately 1:00 p.m., specifically for Mrs. Tirey's anticipated discharge, which occurred at approximately 5:00 p.m.

43. No interpreter was provided for Mrs. Tirey's discharge.

44. Both Mr. and Mrs. Tirey had questions about the discharge, but were afraid to ask.

45. Mrs. Tirey in particular wanted to asked about the bloodwork, to be certain that the numbers were normal and that she should be discharged.

46. Mrs. Tirey also wanted to be certain that she was not being inappropriately discharged, based on her prior experience of being discharged only to return a few hours later.

47. Although Mrs. Tirey hesitantly signed the discharge instructions, having just undergone a severe medical event, surgery, and return to hospitalization for complications, she was not able to clearly understand all of the paperwork, including the follow up instructions and the potential problems that could arise.

48. Defendant's staff had previously threatened to call security on Mr. Tirey after the lack of communication regarding the medical student coming into Mrs. Tirey's room. Because of this threat, Mr. Tirey was afraid to ask any questions, regardless of the type of communication, concerned that he might be asked to leave, requiring his wife to go through the discharge process alone.

49. By this point, the Tireys had spent seven (7) days at the Defendant's facility.

50. Mrs. Tirey was recuperating from a very recent surgery, subsequent complications, and was exhausted, for many reasons: (1) the medical condition itself, (2) having to constantly advocate for the live ASL interpreter to which she was entitled; and (3) from having to bear the burden of attempting to communicate throughout emergency medical treatment in the manner chosen by the Defendant, being denied a live ASL interpreter for the majority of her medical care.

51. Mr. Tirey spent the majority of that same period with Mrs. Tirey at the hospital, getting limited, but certainly not restorative sleep. When he was not at the hospital, he was making sure that his grandmother or mother-in-law, who were taking care of the Tireys' two-month old daughter during this time, had all that they needed. He was exhausted, for the reasons

just stated, and (1) from concern about his wife's medical condition; (2) from having to constantly advocate for a live ASL interpreter to which both he and his wife were entitled; (3) from attempting to advocate for his wife's medical needs without a live ASL interpreter; and (4) from having to bear the burden of attempting to communicate throughout a medical emergency in the manner chosen by the Defendant, being denied a live ASL interpreter for the majority of his wife's medical care.

52. As a result of the Defendant's failure to provide effective auxiliary aids and service, the Plaintiffs did not clearly understand the reasons for Mrs. Tirey's admission; the purposes of the treatments being provided; the common risks and/or benefits of the those treatments; the common risks, side effects, and benefits of medications given; the specific dosage instructions for medications given; the existence of any alternative treatments; the approximate length of care; or the details of any aftercare or discharge instructions, among other things.

53. Defendant's discrimination against the Plaintiffs regarding Mrs. Tirey's medical state, and the Plaintiffs' resulting lack of understanding of her medical care, cause the Plaintiffs to suffer humiliation, anger, frustration, stress, anxiety and emotional distress.

54. Defendant and its staff knew that the Plaintiffs were deaf and were aware that the Plaintiffs made repeated requests for interpreters.

55. Defendant also knew or should have known of their obligation as a health care provider under the ADA, the RA, and their equivalents to develop policies to promote compliance with these statutes and to provide reasonable accommodations, including, but not limited to, the provision of live ASL interpreters to ensure effective communication with deaf persons.

56. Defendant and its staff knew or should have known that their actions and/or inactions created an unreasonable risk of causing the Plaintiffs greater levels of fear, anxiety, indignity, humiliation, and/or emotional distress than a hearing person would be expected to experience.

57. Nonetheless, the Defendant prevented the Plaintiffs from benefitting from its services by failing to provide the live ASL interpreters necessary for the Plaintiffs' participation in Mrs. Tirey's medical care.

58. In doing so, the Defendant intentionally discriminated against the Plaintiffs and acted with deliberate indifference to their federally protected rights.

59. The Defendant's wrongful and intentional discrimination against the Plaintiffs on the basis of their respective disabilities are reflected by the Defendant's failure to train employees and promulgate policies of non-discrimination against deaf individuals.

60. As a result of the Defendant's failure to ensure effective communication with the Plaintiffs, the Plaintiffs received services that were objectively substandard and that were inferior to the services provided to patients who were hearing.

61. The Plaintiffs are entitled to equal access to services offered by the Defendant as are enjoyed by non-disabled persons.

62. The provision of live ASL interpreters at sporadic times by the Defendant indicates that the Defendant and at least some of its employees or agents knew that they were required to provide live ASL interpreters to facilitate Mrs. Tirey's medical care and Mr. Tirey's advocacy for Mrs. Tirey as her spouse, next-of-kin and health care power of attorney.

## VIOLATIONS OF THE PATIENT PROTECTION AND AFFORDABLE CARE ACT

63. The Plaintiffs repeat and reallege all proceeding paragraphs in support of this claim.

64. At all times relevant to this action, Section 1557 of the Patient Protection and Affordable Care Act has been in full force and effect and has applied to the Defendants' conduct.

65. At all times relevant to this action, the Plaintiffs had substantial limitations to the major life activities of hearing and speaking, are and were at the time, individuals with disabilities within the meaning of Section 1557 of the Patient Protection and Affordable Care Act, 42 U.S.C. § 18116.

66. At all times relevant to this action, the Plaintiffs' primary or exclusive language for communication was American Sign Language, (rather than English, either spoken or written). The Plaintiffs therefore have been individuals with limited English proficiency within the meaning of Section 1557 of the Patient Protection and Affordable Care Act, 45 C.F.R. § 92.4.

67. At all times relevant to this action, the Defendant received federal financial assistance, including Medicare and/or Medicaid reimbursements, and has been principally engaged in the business of providing health care. Therefore, Defendant is a health program or activity receiving federal financial assistance pursuant to 42 U.S.C. § 18116(a).

68. Pursuant to Section 1557 of the Patient Protection and Affordable Care Act, "an individual shall not, on the ground prohibited under . . . section 504 of the Rehabilitation Act of 1973 (29 U.S.C. § 794), be excluded from participation in, be denied the benefits of, or be subjected to discrimination, under any health program or activity, any part of which is receiving federal financial assistance." 42 U.S.C. § 18116.

69. Federal regulations implementing Section 1557 of the Patient Protection and Affordable Care Act provide that "[a] covered entity shall take reasonable steps to provide meaningful access to each individual with limited English proficiency eligible to be served or likely to be encountered in its health programs and activities." 45 C.F.R. § 92.201.

70. Federal regulations implementing Section 1557 of the Patient Protection and Affordable Care Act provide that "(1) A covered entity shall offer a qualified interpreter to an individual with limited English proficiency when oral interpretation is a reasonable step to provide meaningful access for that individual with limited English proficiency; and (2) A covered entity shall use a qualified translator when translating written content in paper or electronic form." 45 C.F.R. § 92.201(d).

71. Federal regulations implementing Section 1557 of the Patient Protection and Affordable Care Act provide that "[a] covered entity that provides a qualified interpreter for an individual with limited English proficiency through video remote interpreting services in the covered entity's health programs and activities shall provide: (1) Real-time, full-motion video and audio over a dedicated high-speed, wide-bandwidth video connection or wireless connection that delivers high-quality video images that do not produce lags, choppy, blurry, or grainy images, or irregular pauses in communication; (2) a sharply delineated image that is large enough to display the interpreter's face and the participating individual's face regardless of the individual's body position; (3) a clear, audible transmission of voices; and (4) adequate training to users of the technology and other involved individuals so that they may quickly and efficiently set up and operate the video remote interpreting." 45 C.F.R. § 92.201(f).

72. Federal regulations implementing Section 1557 of the Patient Protection and Affordable Care Act provide that "[a] covered entity shall take appropriate steps to ensure that communications with individuals with disabilities are as effective as communications with others in health programs and activities." 45 C.F.R. § 92.202(a).

73. Federal regulations implementing Section 1557 of the Patient Protection and Affordable Care Act provide that "(1) A [covered] entity shall furnish appropriate auxiliary aids and services where necessary to afford individuals with disabilities, including applicants, participants, companions, and members of the public, an equal opportunity to participate in, and enjoy the benefits of, a service, program, or activity of a [covered] entity . . . in determining what types of auxiliary aids and services are necessary, a public entity shall give primary consideration to the requests of the individuals with disabilities. In order to be effective, auxiliary aids and services must be provided in accessible formats, in a timely manner, and in such a way as to protect the privacy and independence of the individual with a disability." 45 C. F. R. § 92.202(a); 28 C.F.R. § 35.160(b).

74. As set forth above, the Defendant discriminated against the Plaintiffs, on the basis of a disability, in violation of the Patient Protection and Affordable Care Act and its implementing regulations.

75. The Patient Protection and Affordable Care Act, by incorporating the enforcement mechanism of the Rehabilitation Act, extends a cause of action to "any person aggrieved" by discrimination in violation thereof. 42 U.S.C. § 18116(a).

76. The Defendant has failed to implement policies, procedures, and training of staff necessary to ensure compliance with the Patient Protection and Affordable Care Act.

77. The Plaintiffs are therefore entitled to injunctive relief, attorneys' fees, costs, and disbursements, and compensatory damages for the injuries and losses they sustained as a result of the Defendants' discriminatory conduct and deliberate indifference as hereinbefore alleged, pursuant to 42 U.S.C. § 18116(a).

78. Pursuant to the continuing violation doctrine, the court should toll the limitations period to include the period of February 10, 2022 through February 14, 2022, which represents the precipitating event that began the pattern of wrongful conduct.

## PRAYER FOR RELIEF

The Plaintiffs pray that this Court grant the following relief:

a. Enter a declaratory judgment, pursuant to *F. R. Civ. P.* 57, stating that the Defendant's policies, procedures and practices have subjected the Plaintiff to unlawful discrimination in violation of Section 1557 of the Patient Protection and Affordable Care Act.

b. Issue an injunction forbidding the Defendant from implementing or enforcing any policy, procedure, or practices that denies deaf or hard of hearing individuals, or their companions, meaningful access to and full equal enjoyment of Defendants' facilities, services, or programs;

c. Issue an injunction ordering Defendant:

   i. to develop, implement, promulgate, and comply with a policy requiring that when a deaf or hard of hearing individual requests as in-person interpreter for effective communication, one will be provided as soon as practicable in all services offered by the Defendants;

ii. to develop, implement, promulgate, and comply with a policy to ensure that Defendants will notify individuals who are deaf or hard of hearing of their right to effective communication. This notification will include posting explicit and clearly marked and worded notices that the Defendants will provide sign language interpreters, videophones, and other communication services to ensure effective communication with deaf or hard of hearing persons;

iii. to develop, implement, promulgate, and comply with a policy to ensure that deaf or hard of hearing individuals are able to communicate through the most appropriate method under the circumstances, recognizing that VRI is not appropriate in all medical situations;

iv. to develop, implement, promulgate, and comply with a policy to ensure, in the event the Defendant utilizes a Video Remote Interpreting (VRI) System, that such system has a high-speed internet connection; a video Screen with appropriate size, position, capture angle, focus, and proximity to the deaf individual; and appropriate audio quality. When possible, the equipment should be portable and made available to the patient where the patient is located, preferably in a private room to Minimize distractions and maintain confidentiality;

v. to train all their employees, staffs, and other agents on a regular basis about how to properly use VRI services (including how to set up the VRI system and how to obtain technical assistance in case of system

malfunction or failure) and how to obtain interpreters when reasonably requested by deaf or hard of hearing individuals;

vi. to create and maintain a list of sign language interpreters and ensure availability of such interpreters at any time of day or night;

vii. to train all employees, staff, and other agents on a regular basis about the rights of individuals who are deaf or hard of hearing under the ACA;

d. Award to Plaintiffs:

i. compensatory damages pursuant to the ACA;

ii. Reasonable costs and attorneys' fees pursuant to the ACA;

iii. Interest on all amounts at the highest rates and from the earliest dates allowed by law; and

iv. Any and all other relief that this Court finds necessary and appropriate.

## DEMAND FOR JURY TRIAL

Somer Tirey and Hunter Tirey demand a trial by jury against the Defendant, Parkridge Medical Center, Inc., for all of the issues that a jury made decide, and for all of the requested relief that a jury may award.

**LAW OFFICE OF SHARON MCMULLAN MILLING**

By: *Sharon M. Milling*

Sharon McMullan Milling, BPR No. 36876
P.O. Box 312
Hixson, TN 37343
Telephone: 423-902-8700
Email: sharon.milling@gmail.com